**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. CR-14-170-D |
| ) | |
| WES YUI CHEW, ) | |
|   a/k/a Wesley Yui Chew, and ) | |
| ICON TELECOM, INC., ) | |
| ) | |
| Defendants. ) | |

**RESPONSE TO DEFENDANTS WES CHEW
AND ICON TELECOM INC.'S SENTENCING MEMORANDUM**

The United States respectfully opposes Wes Chew's request that he receive a sentence of no more than a year and a day for his role in a $20 million fraud on a federal program. He offers no compelling reason for a variance below the advisory range of 63-78 months' imprisonment—a range that is actually quite reasonable given the size of the offense conduct, his leadership role, and his company's deliberate efforts to disguise the Lifeline fraud. The factors under Section 3553(a) factors counsel a sentence within his advisory range.

This response focuses on three issues raised in Mr. Chew's sentencing memo: (1) his characterization of the $27 million in forfeited funds; (2) his explanation for certain 2013 transactions; and (3) his arguments about general deterrence.

1

# I.   RESPONSES TO MR. CHEW'S ARGUMENTS

## A.   The Lawful Seizure of $27 Million in October 2013 Provided a Starting Point and Important Context for Resolution of this Case.

Mr. Chew characterizes the $27 million of forfeited funds as something akin to a generous and self-imposed penalty for his wrongdoing.  He says that he "agreed to the forfeiture of over $27 million, knowing such an amount exceeded the amount owed to USAC as *either* criminal proceeds *or* civil overbillings." Doc. 43, at 9.  In arguing for a minimal sentence, Mr. Chew claims that he "has already been subjected to the imposition of financial burdens.  He has agreed to forfeit over $27 million, which is $12 million more than the remaining restitution owed to the United States.  Essentially, Mr. Chew and ICON have already been penalized $12 million." *Id.* at 15-16.  His forfeiture of $27 million is best understood, though, in the broader context of this case's investigation and disposition and the scope of forfeiture law.

In October 2013, the United States applied for and obtained warrants from this Court to seize approximately $27 million in three bank accounts under Mr. Chew's control.  *See* Case No. M-13-468-M (authorizing seizure of approximately $20,542,740.73 in U.S. currency from an Ally Bank account in Mr. Chew's name); Case No. M-13-469-M (authorizing seizure of approximately $6,239,844.73 of U.S. currency from an ICON account at BancFirst); Case No. M-13-470-M (authorizing seizure of approximately

$246,089.09 of U.S. currency from an ICON account at BancFirst). The accounts consisted almost exclusively of Federal Communications Commission ("FCC") proceeds from the Lifeline program. The Court authorized seizure of the accounts as property involved in money laundering transactions under 18 U.S.C. § 1957. 18 U.S.C. § 981(a)(1)(A). Currency in each account was involved in or traceable to a wire transfer violating Section 1957(a); Mr. Chew and ICON knew that more than $10,000 of the transfer were the proceeds of wire fraud from fraudulent Lifeline submissions.

Months later, in his plea agreement, Mr. Chew agreed to forfeit his interest in the $20 million Ally Bank account because those funds were involved in the money laundering count to which he pled guilty. Doc. 10, at 4. The two seized ICON accounts were not involved with that count, so the government filed a civil complaint with this Court to secure ownership of those funds. *See* Case No. 14-CIV-745-D, Doc. 1. On October 22, 2014, the Court granted default judgment to the United States for the currency.

Given the available statutory tools with forfeiture and restitution, the government could have sought civil or criminal forfeiture of the $27 million and an *additional* $20 million or so from ICON in criminal restitution. *See generally United States v. McGinty*, 610 F.3d 1242, 1247 (10th Cir. 2010) ("Forfeiture and restitution are distinct remedies. Restitution is remedial in nature, and its goal is to restore the victim's loss. Forfeiture, in contrast, is

3

punitive; it seeks to disgorge any profits that the offender realized from his illegal activity.") (citations omitted). That has not happened. Instead, in plea agreements with Mr. Chew and ICON, the United States Attorney's Office for the Western District of Oklahoma has agreed that it will recommend to the Department of Justice that the $27 million in forfeited funds be credited toward any Court-ordered restitution to the FCC. Doc. 10, at 4; Doc. 19, at 3.

The history and independent legal basis of the seizures are important to understand resolution of this matter. When local defense counsel was retained, the government had *already* lawfully seized the $27 million in Lifeline-related funds. In the weeks that followed, the government was preparing to file civil complaints to forfeit to the United States all interest in the three accounts under 18 U.S.C. § 981(a)(1)(A). But as part of plea agreements to resolve the case, Mr. Chew agreed to forfeit his interest in the Ally Bank account, and both defendants agreed not to challenge or file a claim in the civil forfeiture proceedings on the two BancFirst accounts.

In the end, the government does not dispute Mr. Chew's reflection that he has "been subjected to the imposition of financial burdens," Doc. 43, at 15, from forfeiting $27 million. And to be clear, the government recognizes and appreciates the unusual circumstances here: before sentencing, the government has secured in full the parties' stipulated restitution total plus millions in additional forfeiture. These "financial burdens," however,

originated from separate and earlier Court authorization through civil proceedings. The government was prepared to pursue $27 million in forfeiture regardless of whether criminal restitution in Mr. Chew's case turned out to be $15 million, $25 million, or $35 million. And because the $27 million was involved in money laundering transactions, all of it was subject to forfeiture, even if the loss to the government turned out to be substantially less. 18 U.S.C. § 981(a)(1)(A) (authorizing forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title . . . ."). Mr. Chew did not come up with the idea of paying $27 million to the government. Rather, the government lawfully seized the funds; *then* the defense agreed as part of a plea *not to contest* such forfeiture in return for the benefits, certainty, and lower criminal exposure of the two-count Information.

    **B.**    **Mr. Chew's Explanations of Certain Financial Affairs Remain Implausible.[1]**

Mr. Chew's financial disclosures and explanations still leave room to question a substantial transaction and attempted transaction in 2013. First, his sentencing memo is noticeably silent in explaining the $6 million that he

---

[1] The government referenced an incorrect date in the last sentence on page 10 of its Sentencing Memo. The government seized Mr. Chew's Ally Bank account in October 2013 (not April 2013). In April 2013, Mr. Chew transferred $20 million from ICON to the new Ally Bank account in his name. Doc. 1, ¶¶ 3, 21.

5

transferred to an overseas HSBC account under his control in July 2013. PSR, ¶ 33.  Mr. Chew claims only that "at this time," he has no signatory authority over the account.  *Id.* at 29.  Has he transferred interest to his mother?  Who owns the account, and does Mr. Chew still have an ability to control it?  Why and for what consideration did he terminate his signatory authority?  Mr. Chew needs an explanation better than the current one if he wants to keep arguing an inability to pay any fine or hefty IRS obligations.  *See* Doc. 43, at 21 ("Mr. Chew and ICON request no additional fines be imposed, based on their inability to pay any significant fine due to the forfeited funds and the amounts owed for federal income taxes.").

Second, Mr. Chew's efforts to contextualize his attempted transfer of $20 million in October 2013 still leave questions.  He explains that he tried to move the money to his mother's California account to avoid the overreach of a September 18, 2013, emergency order by the Oklahoma Corporation Commission ("OCC").  Doc. 43, at 10-11.  In the emergency order, OCC ordered ICON not to "transfer corporate assets."  Doc. 43-7, at 3.  The funds at issue were already in Mr. Chew's personal account at Ally Bank, not in any ICON account.  Nevertheless, he seems to concede that he was trying to evade at least the spirit of the OCC's order.  Further, the attempted transfer occurred only one day after an FCC administrative action for more than $4.7 million in civil penalties.  Doc. 43, at 8.

6

### C. Mr. Chew's Own Statistics Highlight the Need for his Sentence to Deter Other Lifeline Fraud.

Mr. Chew correctly notes that the enrollment of Oklahoma Lifeline customers by ICON's competitors also quickly increased in 2012 and 2013. *Id.* at 4. He has provided to the Court several charts showing disbursements of FCC funds to Oklahoma Lifeline providers during this time. Doc. 43-2.[2] The parties likely agree that Oklahoma was and continues to be susceptible to Lifeline fraud because of the more profitable tribal reimbursement rate. Lifeline enrollments remain high in Oklahoma, and several competitors are no doubt following these proceedings closely. Accordingly, something more substantial than "a short term of imprisonment, combined with the forfeiture and loss of his business," Doc. 43, at 17, is necessary to promote the statutory goal of deterring similar criminal conduct.

---

[2] Exhibit 2 of the defendants' sentencing memo generally reflects FCC disbursements during the relevant period. Doc. 43-2. It is not possible, though, to extrapolate specific numbers of monthly subscribers from this FCC data. In some months, FCC reimbursed companies for two or more months of Form 497 submissions. For example, the spike in October 2012 for Head—the first competitor in that exhibit—stems from FCC payments that month for Head's submissions for August 2012 *and* September 2012.

## II. CONCLUSION

The United States respectfully requests that the Court sentence Mr. Chew within the advisory guidelines range of 63-78 months' imprisonment.

          Respectfully submitted,

          SANFORD C. COATS
          United States Attorney

          *s/Chris M. Stephens*
          CHRIS M. STEPHENS
          Okla. Bar No. 20345
          SCOTT E. WILLIAMS
          Okla. Bar No. 17167
          Assistant U.S. Attorneys
          210 W. Park Avenue, Suite 400
          Oklahoma City, Oklahoma  73102
          Office: (405) 553-8783
          Facsimile: (405) 553-8888
          chris.stephens@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2015, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: Dan Webber and Mary Kate Walters, counsel for defendants.

          *s/Chris M. Stephens*
          CHRIS M. STEPHENS
          Assistant U.S. Attorney